**SO ORDERED: November 15, 2013.**



**Basil H. Lorch III**
**United States Bankruptcy Judge**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF INDIANA
NEW ALBANY DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| EASTERN LIVESTOCK CO., LLC, | ) | CASE NO. 10-93904-BHL-11 |
|       Debtor. | ) | |
| _____ | ) | |
| JAMES KNAUER, as Chapter 11 Trustee for | ) | |
| Debtor, Eastern Livestock Co., LLC., | ) | |
|       Plaintiff, | ) | |
|       v. | ) | ADV. PRO. NO. 12-59147 |
| | ) | |
| LARRY ZEIEN, JR., MICHAEL STEVEN | ) | |
| McDONALD, ROBERT RUFENACHT, | ) | |
| RUFENACHT COMMODITIES, INC., | ) | |
| and ADM INVESTOR SERVICES, INC., | ) | |
|       Defendants. | ) | |
| _____ | ) | |

## ORDER ON DEFENDANTS'
## MOTIONS TO DISMISS

This proceeding was initiated by the filing of the Complaint on December 21, 2012, which was subsequently amended on February 15, 2013, and now comes before the Court on the **Defendant ADM Investor Services, Inc.'s Motion to Dismiss Amended Complaint, with Prejudice** [Docket No. 39]; **Defendant Larry Zeien II's Motion to Dismiss Amended Complaint**

with Prejudice [Docket No. 41]; and **Defendants Robert Rufenacht and Rufenacht Commodities, Inc.'s Motion to Dismiss Amended Complaint, with Prejudice** [Docket No. 43], each filed on March 25, 2013. The **Trustee's Response to Motions to Dismiss**[1] was filed on May 8, 2013. On June 7, 2013, a **Reply by ADM Investor Services, Inc. to Trustee's Response to Motions to Dismiss** was filed, along with **Defendant Larry Zeien II's Reply** and **Defendants Robert Rufenacht and Rufenacht Commodities, Inc's Reply**. The Court conducted a hearing on July 10, 2013, at which time the parties presented oral argument to the Court.

Background Facts

The Trustee's Amended Complaint consists of five counts. The focus of the Trustee's action involves the transfer of $31,150,300 from the Debtor's accounts into the personal bank account of the Debtor's principal, Thomas Gibson, through the hands of Zeien, Rufenacht, Rufenacht Commodities and then to ADM Investor Services, Inc., before it completed the round-trip circuit back into Gibson's personal account. Those transfers, according to the Trustee, enabled Gibson to manipulate his financial records so as to orchestrate a massive check kiting scheme to the detriment of his creditors and ultimately, the Debtor. The Trustee now seeks to avoid and recover those transfers based upon actual and constructive fraud and has asserted a violation of the Indiana RICO statute. He also asks the Court to disallow any of the Defendants' claims in the underlying bankruptcy proceeding.

For purposes of this motion to dismiss, the Court must assume the truth of the facts alleged in the amended complaint and view those facts and any inferences therefrom in the light most

---

[1] The Trustee's pleading is a combined response to the three separate motions filed by individual Defendants.

2

favorable to the Plaintiff. *Yeksigian v. Nappi*, 900 F.2d 101, 102 (7th Cir. 1990).  The Court, therefore, accepts the following pertinent facts as true:

1.  Eastern Livestock Corporation ("ELC") was one of the largest cattle dealers in the United States until its closure on or about November 2, 2010, processing cattle sales and operating branch facilities in eleven states.

2.  Thomas Parish Gibson ("Gibson") was an owner of ELC and manager of the business.  Defendant Michael Steven McDonald ("McDonald") was ELC's Operations Manager and was responsible for management and oversight of ELC's Line of Credit, among other things;

3.  Defendant Larry Zeien, Jr. ("Zeien") was an employee of ELC and was responsible for the operations of Defendant Rufenacht Commodities, Inc.'s ("RCI") branch office located within ELC's headquarters.

4.  Defendant Robert Rufenacht ("Rufenacht") is an owner and agent of RCI and a branch manager and financial consultant for ADM Securities, Inc., a subsidiary of ADMIS.

5.  ADMIS is a wholly-owned commodity futures brokerage subsidiary of Archer Daniels Midland Company ("ADM") and is a futures clearing merchant.  ADMIS specializes in providing commercial hedgers, traders, brokers, and risk managers with execution and clearing services.  ADMIS works through a network of Introducing Brokers ("IB"), non-clearing futures commission merchants, branch offices, subsidiaries and sister companies across the United States and around the globe.

6.  ADMIS engaged RCI as an IB.

7.      In order to facilitate its daily business operations, ELC entered into credit and security agreements with Fifth Third Bank ("Fifth Third") on August 9, 2004. Under the terms of those agreements, Fifth Third extended a revolving line of credit to ELC ("Line of Credit").

8.      Accessing funds from the Line of Credit on a daily basis was essential to the operation of ELC because the monies were needed by ELC to make timely payments for its daily cattle purchases. ELC represented that it purchased, on average, $10 to $20 million in cattle every day. The reality was that ELC was purchasing on average approximately $3.5 million in cattle per day and the remainder of the purported volume was made up of bogus cattle transactions.

9.      Under the terms of the credit agreement with Fifth Third, funds were extended to ELC based, in part, on the value of ELC's outstanding accounts receivable, reported daily by ELC to the bank through submission of a Borrowing Base Certificate. McDonald, at the direction of Gibson, was responsible for causing the preparation and submission of the Borrowing Base Certificates on a daily basis to Fifth Third.

10.     Also under the terms of the credit agreement, ELC maintained a Cash Collateral Account with Fifth Third into which ELC deposited, on a daily basis, receipts from operation of its business, which were principally derived from ELC's sale of cattle. Funds deposited into the Cash Collateral Account were automatically transferred by Fifth Third to make payments against ELC's $32.5 million Line of Credit. These payments reduced the balance owed on the Line of Credit, thereby increasing the amount of available funds for use by ELC. ELC used the funds from the Line of

4

Credit on a daily basis to fund checks being presented for payment to ELC and to conduct its daily business as a cattle dealer. The availability of approximately $10 to $20 million in cash on a daily basis from the Line of Credit was essential to the operation of ELC's business.

11. Gibson and McDonald knowingly and intentionally engaged in a check-kiting scheme by causing billions of dollars of checks to be issued from various bank accounts, including Gibson's personal account with Your Community Bank ("TPG/YCB") and bank accounts belonging to agents and business associates of Gibson and McDonald, in amounts which exceeded available balances in the affected accounts, causing artificially inflated balances in ELC's Cash Collateral Account. The purpose for engaging in the check-kiting scheme was to induce Fifth Third, through fraud and deceit, to continue to release funds to ELC under the Line of Credit.

12. It was further a part of the conspiracy that McDonald, at the direction and with the consent of Gibson, knowingly and intentionally prepared and caused to be prepared and submitted to Fifth Third fraudulent Borrowing Base Certificates, which contained falsely inflated accounts receivable figures, consistent with amounts of check-kiting occurring each day. The purpose for the preparation and submission to Fifth Third of false and fraudulent Borrowing Base Certificates was to fraudulently induce the bank to continue to release funds to ELC under the Line of Credit.

13. The Line of Credit expired on October 15, 2010, and was not thereafter renewed by the bank. The check-kiting scheme against Fifth Third continued, however, causing

artificially inflated balances in one of ELC's operating accounts with Fifth Third until such account was closed by the bank on November 2, 2010.

14. In the calendar year 2009, ELC funds in the approximate amount of $118,868,688.85 were wrongfully deposited in to the TPG/YCB Account.

15. In the calendar year 2010, ELC funds in the approximate amount of $1,079,434,770.36 were wrongfully deposited into the TPG/YCB Account.

16. In furtherance of the check kiting scheme, Gibson and McDonald caused checks to be written out of the TPG/YCB Account, payable to ADM Investor Services, c/o Rufenacht Commodities, Inc. ("the ADMIS Checks").

17. The ADMIS Checks were sent to Rufenacht and subsequently deposited by Rufenacht into an ADMIS account owned by Gibson. ADMIS would then wire funds directly back into the TPG/YCB Account, which wires contained the following information:

Wire Transfer Credit
ADM INVESTOR SERV. INC CUST SE
ATTN: THOMAS KADLEC
SUITE 1600A
CHICAGO, IL 60604

18. At all times relevant to this action, Thomas Kadlec was either the Chief Financial Officer or the President of ADMIS.

19. After the TPG/YCB Account received the wires, Gibson would write a check to ELC for deposit into ELC's account at Fifth Third.

20. In furtherance of the check kiting scheme set forth above, $31,150,300.00 of ELC funds were transferred to ADMIS.

21.     On or about September 21, 2011, Gibson and McDonald were charged with Mail Fraud in violation of 18 U.S.C. § 1341 in the United States District Court for the Western District of Kentucky under Cause Number 3:11-cr-00123-TBR-1, for actions related to the check kiting scheme.  On or about December 13, 2012, Gibson pled guilty to the federal charge of Mail Fraud.

22.     Further, Gibson, McDonald, and two others were indicted by a Kentucky grand jury of 17 counts of theft by deception over $10,000, 144 counts of theft by deception over $500 and under $10,000 and 11 counts of theft by deception under $500.  Gibson and McDonald pled guilty to all of the state charges and were both sentenced to ten years in prison.

<u>Discussion</u>

The Trustee has brought a claim against the Defendants for violation of Indiana's RICO Act and also seeks to recover transfers of property from ELC deposit accounts to ADMIS in the two years preceding the filing of this bankruptcy which totaled in excess of thirty-one million dollars. As to the Defendants' individual roles in the scheme, the Trustee alleges that Gibson and McDonald wrongfully siphoned funds out of ELC and into the TPG/YCB Account; that Gibson conspired with Rufenacht and/or RCI to create one or more financial services accounts at ADMIS; that Zeien aided and abetted in causing checks to be written out of the TPB/YCB Account payable to ADM Investor Services c/o RCI and deposited into one of the ADMIS Accounts.  As to ADMIS in particular, the Trustee alleges that the ADMIS checks and wires served no legitimate business purpose and were merely part of the massive check kiting scheme.  He further asserts that ADMIS was complicit in the transfer of funds into the TPG/YCB Account knowing that the funds were owned by ELC and

not Gibson.

<u>Sufficiency of Pleading</u>

The Defendants argue that the allegations of fraud contained in the Trustee's Complaint are inadequate under *Twombly* standards and lack the particularity required by virtue of Rule 9(b) of the Federal Rules of Civil Procedure. The Court rejects both of these arguments and finds that the Trustee's allegations are sufficient to state a claim upon which relief can be granted under Rule 12(b)(6). As noted by ADMIS in their brief, in order to survive a motion to dismiss post-*Twombly*, "'the plaintiff must give enough details about the subject matter of the case to present a story that holds together,' and the question the court should ask is 'could these things have happened, not did they happen.'" *Estate of Davis v. Wells Fargo Bank*, 633 F.3d 529, 533 (7th Cir. 2011) (quoting *Swanson v. Citibank, N.A.,* 614 F.3d 400, 404-405 (7th Cir. 2010)).

The Trustee contends that, in a complex case such as this, he should be afforded greater latitude in pleading fraud. *See, Picard v. Estate of Stanley Chais (In re Bernard L. Madoff Inv. Sec. LLC)*, 445 B.R. 206, 219 (Bankr.S.D.N.Y. 2011) ("[g]reater liberality in the pleading of fraud is particularly appropriate in bankruptcy cases, because . . . it is often the trustee, a third party outsider to the fraudulent transaction, that must plead the fraud on secondhand knowledge for the benefit of the estate and all of its creditors"). Defendants, on the other hand, assert that the complexity of this case demands more factual specificity instead of less. *Limestone Dev. Corp. v. Vill. of Lemont*, 520 F.3d 797, 803 (7th Cir. 2008) (affirmed dismissal of RICO complaint, noting "[i]n a complex antitrust or RICO case a fuller set of factual allegations. . . may be necessary to show that the plaintiff's claim is not 'largely groundless' [cit. omit]"); *Kaye v. D'Amato*, 357 Fed.Appx. 706, 710 (7th Cir. 2009) ("[w]hile dismissal of a RICO claim is appropriate if the plaintiff fails to allege sufficient facts to

8

state a claim that is plausible on its face, the adequate number of facts varies depending on the complexity of the case"). The parties do, however, seem to agree that in order to survive dismissal on a Rule 12(b)(6) motion, the complaint must state the "who, what, when, and where" of the alleged fraud. *See, Lachmund. v. ADM Investor Services, Inc.*, 191 F.3d 777, 781 (7th Cir. 1999).

In *Pirelli Armstrong Tire Corp. - Retiree Medical Benefits Trust v. Walgreen Co.*, 631 F.3d 436 (7th Cir. 2011), the Court elaborated on the particularity requirement of the Rules of Civil Procedure. In that case, the plaintiff alleged that Walgreens pharmacy systematically took prescriptions that were written for a generic form of two popular drugs and illegally substituted a more expensive form of the drug. The plaintiff based its allegations of fraud on a "preliminary review" of its own reimbursement data, on information contained in an earlier whistleblower suit, as well as from an investigation conducted by another benefit management firm in other jurisdictions. The Court, in "adding flesh to the bones of the word particularity", noted:

> . . .because courts and litigants often erroneously take an overly rigid view of the formulation, we have also observed that the requisite information – what gets included in that first paragraph – may vary on the facts of a given case. *Emery v. Am. Gen. Fin., Inc.*, 134 F.3d 1321, 1324 (7th Cir. 1998) (flexibility when information lies outside of plaintiff's control); *In re HealthCare Compare Corp. Secs. Litig.*, 75 F.3d 276, 285 (7th Cir. 1996) (Ripple, J., dissenting) (noting that reasonable minds can and will differ on the adequacy of a given fraud averment); *see also Shushany v. Allwaste, Inc.*, 992 F.2d 517, 521 (5th Cir. 1993) ("[w]hat constitutes 'particularity' will necessarily differ with the facts of each case....").

*Id.* at 441-442. Explaining the level of detail required, it was further noted that while a plaintiff does not have "unlimited leeway" in pleading allegations on information and belief, "the practice is permissible so long as (1) the facts constituting the fraud are not accessible to the plaintiff and (2) the plaintiff provides 'the grounds for his suspicions.'" *Id.* (citing *UniQuality, Inc. v. Infotronx, Inc.* 974 F.2d 918, 924 (7th Cir. 1992); *Bankers Trust Company v. Old Republic Insurance Company*, 959

F.2d 677, 684 (7th Cir. 1992).)  In that case, the Court ultimately concluded that the plaintiff could "easily have done more" in substantiating its allegations of fraud.  Because the further particulars of the alleged fraud could have been obtained without discovery by taking "a more fulsome look at its own data", the Court found that it did not fulfill Rule 9(b)'s purpose and thus dismissed the plaintiff's complaint.

The Court, having carefully reviewed the specific allegations of the Amended Complaint, finds that the Trustee has given grounds for his suspicions and thus has met the threshold requirements required by Rule 9(b).

<u>Safe Harbor Provision of § 546(e)</u>

Additionally, the Defendants contend that the safe harbor provision set out in section 546(e), which provides that "the trustee may not avoid . . . a transfer made by or to (or for the benefit of) a commodity broker . . . in connection with a . . . commodity contract" serves to preclude the Trustee's attempts to avoid the subject transfers under 548(a)(1)(B).  The Trustee asserts, in response thereto, that the transfers were not legitimate business transactions and were not "in connection with" a commodity contract, and thus section 546(e) is inapplicable.  The Court is inclined to agree at this juncture of the proceedings.

As noted by this Court in an earlier decision, the safe harbor provision is designed to protect the stability of financial markets.  If, in fact, the challenged transfers were in furtherance of a check kiting scheme and not legitimately related to a commodity contract, it would hardly serve the purposes underlying the statute to enforce that provision.  *See, Grede v. FCStone, LLC*, 485 B.R. 854, (N.D.Ill 2013).  As noted by that court, "[t]he safe harbor functions as a firewall that insulates *legitimate* securities and commodities transactions from avoidance because of the potential

10

destabilizing effects that unwinding such trades could have on the broader market." *Id.* at 885 (emphasis added).

Nor does the Court find, contrary to the Defendants' suggestion, that the rationale of *In re Lehman Holdings Inc.*, 469 B.R. 415 (Bankr. S.D.N.Y. 2012), mandates a different result. In that case, Lehman Holdings brought suit against a bank whose economic coercion fueled Lehman's financial ruin. The bankruptcy court noted that the challenged transactions were "precisely the sort of contractual arrangements that should be exempt from being upset by a bankruptcy court under the more lenient standards of constructive fraudulent transfer or preference liability: these are systemically significant transactions between sophisticated financial players at a time of financial distress in the markets – in other words, the precise setting for which the safe harbors were intended." *Id.* at 422. While the bank may have abused the power of its position to improperly extract additional collateral and other concessions shortly before Lehman's bankruptcy, the transfers were admittedly "legitimate" and "in connection with" a securities contract. That case, unlike this one, presented "important questions as to what a lender can do in managing its exposure to potential losses and protect its interests at a time of intensifying concerns about systemic risk." *Id.* at 419.

### Implication of Section 550(a)

ADMIS and Rufenacht, citing *Weinman v. Simons (In re Slack-Horner Foundries, Co.)*, 971 F.2d 577 (10th Cir. 1992) assert that section 550 of the Bankruptcy Code requires the Trustee to avoid the initial transfer to Gibson under section 548 before he can look to subsequent transferees for recovery. The Trustee, citing *IBT International, Inc. v. Northern (In re International Administrative Services, Inc.)*, 408 F.3d 689 (11th Cir. 2005), notes that courts have utilized differing approaches to section 550. Where an initial transferee acts merely as an intermediary in passing funds to another

transferee, some courts employ a "mere conduit" concept which allows recovery from the subsequent transferee as the "initial recipient." *Id.* at 705. Yet another approach to avoiding transfers, the "pragmatic" approach, eliminates the distinction between initial transferees and mediate transferees and permits recovery against any transferee. In such cases, however, "in order to incur liability as a transferee, a party must have exercised a degree of dominion and control over the property transferred, or held some sort of beneficial right in it." *Id.* at 707 (citing *In re Paramount Citrus, Inc.*, 268 B.R. 620 (M.D.Fla. 2001)). Although the Seventh Circuit has not had occasion to address this issue, at least one court within this circuit has adopted the so-called pragmatic approach, holding that section 550(a)(1) "allows the Trustee to pursue either the initial transferee or the entity for whose benefit the transfer was made." *Brown v. Phillips (In re Phillips)*, 379 B.R. 765, 786 (N.D.Ill. 2007). This Court likewise adopts such logic.

Zeien contends that he was a "mere conduit" and, as such, bears no responsibility for any funds that passed through his hands.[2] A "mere conduit" may not be considered an initial transferee for purposes of section 550(a) where no control is exercised over the debtor's property. This analysis is most often used where a bank acts as an intermediary in transferring assets. *See, e.g., In re Coutee*, 984 F.2d 138 (5th Cir. 1993); *Bonded Financial Services, Inc. v. European American Bank*, 838 F.2d 890 (7th Cir. 1988). But Zeien goes even further to assert that he was not a transferee at all. As argued by Zeien, the term transferee does not include anyone who touches the money, and must mean something different from "possessor" or "holder" or "agent." *Bonded Fin. Servs., Inc. v. European American Bank*, 838 F.2d 890, 893 (7th Cir. 1988). In that case, the Seventh Circuit noted

---

[2] ADMIS adopted Zeien's arguments in support of the "conduit" defense in its Reply Brief and, as such, asserts that all the Defendants were mere conduits of the ADMIS checks with the counterparties to the commodity contracts being the ultimate transferees.

that "the minimum requirement of status as a 'transferee' is dominion over the money or other asset, the right to put the money to one's own purposes." *Id.* at 893.

The conduit rule, according to the Eleventh Circuit, "presumes that the facilitator of funds acts without bad faith, and is simply an innocent participant to the underlying fraud." *In re IAS,* 408 F.3d at 705 (citations omitted). In that case, the court observed:

> These initial transferees do not conjure images of well-intentioned, but gullible, parties who mistakenly fell victim to a massive conspiracy between the Debtor and the Defendants. To the contrary, these entities had intimate and thorough knowledge of the transactions and their desired effect. Money changed multiple hands, twenty-three entities filtered IAS funds away from creditors. [They] were the architects of a masterful plan aimed at diluting [Debtor's] coffers and lining their own pockets. To hold them to be innocent parties would contravene the character of a fraudulent transfer action, the purpose of which is to expose fraudulent dealings.

*Id.* at 706.

The Trustee alleges that Zeien was an active participant in the fraud, that he issued some of the ADMIS Checks which were sent to Rufenacht and subsequently deposited by Rufenacht into an ADMIS account owned by Gibson. ADMIS allegedly wired funds directly back into the TPG/YCB Account, which transfers, according to the Trustee, served no legitimate purpose. If the Trustee's allegations are correct, the Defendants' actions enabled Gibson to create the "float" which gave life to his massive check kiting scheme, and Zeien, Rufenacht and ADMIS all benefitted by the scheme by taking commissions and fees on the transactions.

While the Defendants are not foreclosed from asserting the conduit theory at trial, for purposes of this motion, the Court is bound to accept the allegations of the Trustee's amended complaint as true. Because the Trustee has alleged that the Defendant transferees benefitted from, and were complicit in, the check kiting scheme, good faith is in issue, and thus the defense fails.

<u>Estoppel, Laches, or Waiver</u>

The Defendants argue that the Trustee's fraudulent transfer claims are barred by the doctrine of collateral estoppel because this Court determined that the funds in the ADMIS Account are property of the Gibsons' bankruptcy estate and thus cannot be property of the ELC estate.  Because the Trustee's claims in this case differ significantly from the operative facts giving rise to the trustee's turnover motion in the Gibson case, however, the Court finds that estoppel is not warranted.  Further, the Court finds that Trustee has acted diligently in pursuing claims and, there being no showing of material prejudice to the Defendants, rejects the Defendants' claim of laches.  Finally, the Court finds no basis for holding that the Trustee has waived its claims against the Defendants.

<u>Indiana RICO</u>

Under I.C. 34-24-2-6(b), an "aggrieved person" may bring a civil RICO action against a person who has violated Indiana Code Section 35-45-6-2 "for damages suffered as a result of corrupt business influence."  The Defendants contend that the Trustee does not qualify as an "aggrieved person" and cannot show that any actions allegedly committed by them directly or proximately caused damage to the Debtor, inasmuch as the Debtor, by and through its principal, Thomas Gibson, was the instigator and mastermind behind the check kiting fraud.  Defendants also assert that the Trustee did not adequately plead the elements of the Indiana RICO claim, including knowing and intentional participation, the existence of a RICO enterprise, a pattern of racketeering activity, or causation.  Finally, perhaps foremost among the Defendants' respective arguments in support of dismissal is the asserted defense of *in pari delicto.*

Under the Indiana RICO provisions, a party commits a corrupt business influence:

(1) who has knowingly or intentionally received any proceeds directly or indirectly derived from a pattern of racketeering activity, and who uses or invests those

14

proceeds or the proceeds derived from them to acquire an interest in property or to establish or to operate an enterprise;

(2) who through a pattern of racketeering activity, knowingly or intentionally acquired or maintains, either directly or indirectly, an interest in or control of property or an enterprise; or

(3) who is employed by or associated with an enterprise, and who knowingly or intentionally conducts or otherwise participates in the activities of that enterprise through a pattern of racketeering activity;

I.C. § 35-45-6-2.

While Indiana's RICO statute is patterned after the federal anti-racketeering law, *Wesleyan Pension Fund, Inc. v. First Albany Corp.*, 964 F.Supp. 1255, 1273 (S.D.Ind. 1997), the Indiana Supreme Court has noted a significant difference between the two statutes. *See Keesling v. Beegle*, 880 N.E.2d 1202, 1206 (Ind. 2008). The Indiana Act "impose[s] liability both on persons who conduct the activities of a racketeering enterprise and on those who otherwise participate in the activities of a racketeering enterprise." *Id.*

Elements of an Enterprise

Initially, the Court finds that the Trustee has pled the existence of an "enterprise" as defined in I.C. § 35-45-6-1(c) and in accord with the structure outlined by the Supreme Court in *United States v. Turkette*, 452 U.S. 576, 583, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981); *Boyle v. United States*, 556 U.S. 938, 129 S.Ct. 2237, 173 L.Ed.2d 1265 (2009); *and see Jay E. Hayden Foundation v. First Neighbor Bank, N.A.*, 610 F.3d 382, 388 (7th Cir. 2010) (an enterprise must have "three structural features: (1) a purpose, (2) relationships among those associated with the enterprise; and (3) longevity sufficient to permit these associates to pursue the enterprise's purpose."). As to the first element, the Trustee has alleged a purpose, specifically that the enterprise served to further the Check Kiting Scheme (*Id.* ¶ 90), by falsely reporting revenues (*Id.* ¶¶ 64, 65), which induced Fifth Third to continue to release funds under the Line of Credit (*Id.* ¶¶ 46, 48), and that each Defendant profited

from the scheme (*Id.* ¶¶ 38, 98).

Next, the Court finds that the Trustee detailed the existence of a relationship among those associated with the enterprise. He alleged, as stated hereinabove, that ADMIS engaged Rufenacht Commodities as an IB; that ADMIS is responsible for the actions of Rufenacht Commodities; that Robert Rufenacht was a branch manager and consultant for ADMIS and an agent of ADMIS (Am. Compl. ¶¶ 35-36, 41); that Rufenacht and/or Rufenacht Commodities conspired with Gibson to create the ADMIS accounts that ultimately received the Transfers (*Id.* ¶ 40); that Zeien was an employee and agent of Rufenacht Commodities and operated the branch of Rufenacht Commodities co-located within ELC (*Id.* ¶ 23); that Zeien met with McDonald and Gibson in furtherance of the check kiting scheme; and that Zeien arranged for checks to be written payment to ADMIS and sent to Rufenacht, where they were deposited into an ADMIS account, following which ADMIS would wire funds back to the TPG/YCB account (*Id.* ¶¶ 52, 54, 57-59).

Finally, inasmuch as the Trustee alleged that the enterprise operated in furtherance of its purpose from December 6, 2008, through December 6, 2010, and resulted in improper transfers on one hundred twenty-five (125) occasions, the Court finds that longevity has been properly pled. As noted by the Court in *Boyle*, "the instruction that an enterprise's existence 'is oftentimes more readily proven by what it does, rather than by abstract analysis of its structure' properly conveyed *Tercet*'s point that proof of a pattern of racketeering activity may be sufficient in a particular case to permit an inference of the enterprise's existence." *Boyle*, 556 U.S. at 940. Because the Trustee has sufficiently alleged the existence of an enterprise, the Court finds no basis therein for dismissal.

<u>Proximate Cause</u>

The Defendants argue that Court IV should be dismissed because the Trustee failed to allege

plausible facts that they directly or proximately caused any injuries to ELC. As noted by ADMIS in its Reply Brief, this argument is essentially the same as the "standing" argument asserted by Rufenacht and Rufenacht Commodities, so the Court will address these arguments as a whole.

The Indiana RICO statute affords relief to an "aggrieved person" against a person who has violated IC § 35-45-6-2 "for damages suffered as a result of corrupt business influence." I.C. § 34-24-2-6(b). "A person . . . who is employed by or associated with an enterprise, and who knowingly or intentionally conducts or otherwise participates in the activities of that enterprise through a pattern of racketeering activity; commits corrupt business influence. The Defendants essentially contend that the Trustee does not qualify as an "aggrieved person" and cannot show that any actions allegedly committed by them directly or proximately caused damage to the Debtor, inasmuch as the Debtor, by and through its principal, Thomas Gibson, was the instigator and mastermind behind the check kiting fraud.

To establish standing to sue, a plaintiff to a civil RICO claim must show injury to his business or property. *Evans v. City of Chicago*, 434 F.3d 916, 924-25 (7th Cir. 2006). Beyond that, however, the Defendants urge that the RICO plaintiff must be the intended target of the RICO scheme, citing *In re Am. Express*, 39 F.3d 395, 400 (2d. Cir. 1994) and its progeny. Those cases, having no precedential value, are simply inapplicable. The Indiana statute provides a cause of action for an aggrieved person and not only the intended target of the RICO scheme. Such a finding would supplant the statutory language by redefining "aggrieved person" to be the "intended target" of the RICO scheme. The Court declines the Defendants' invitation to adopt the logic of *American Express*.

17

The state court in *Keesling v. Beegle*, 858 N.E.2d 980 (Ind. App. 2006), discussed liability under Indiana's RICO statute. Finding no cases interpreting the Indiana statute, the court looked to case law interpreting the federal RICO statute and concluded that a showing of proximate cause is required. *Id.* at 991-992 (*citing Holmes v. SIPC.*, 503 U.S. 258, 112 S.C. 1311, 117 LED.2d 532 (1992); *and see Raybestos Prods. Co. v. Younger*, 54 F.3d 1234, (7th Cir. 1995) (while there must be a direct relation between the alleged wrongdoing and consequent harm, "notions of justice and policy often dictate the boundaries of 'proximate causation.'"). The court, however, went on to note:

> We are not bound by the Seventh Circuit's interpretation of Indiana Code Section 34-24-2-6(b), but given that this statute is even more specific than 18 U.S.C. § 1964(c) in requiring a causal relationship between a defendant's racketeering activities and a plaintiff's injuries, we agree that a showing of proximate cause is required for an Indiana RICO claim. The Indiana Supreme Court has stated that '[although a rigorous definition is elusive, proximate cause has been defined as 'that cause which, in natural and continuous sequence, unbroken by any efficient intervening cause, produces the result complained of and without which the result would not have occurred.'"

*Id* at 992 (citing *Peters v. Forster*, 804 N.E.2d 736, 743(Ind. 2004)). "Proximate cause is generally a question of fact for the jury to decide." *Goby v. Whitehead*, 837 N.E.2d 146, 151 (Ind.Ct.App. 2004). In this case, the Trustee has alleged that the portion of the check kiting scheme involving the Defendants served to increase the cash available to ELC through its line of credit by $20 million daily, resulting in unsustainable debt to ELC. The Court finds that there has been an adequate showing of proximate causation.

<u>In Pari Delicto</u>

The doctrine of *in pari delicto* stands for the proposition that "where the wrong of both parties is equal, the position of the defendant is stronger." *Theye v. Bates*, 337 N.E.2d 837, 844 (Ind.App. 1975) (quoting *Perma Life Mufflers, Inc. v. Intern. Parts Corp.*, 392 U.S. 134, 135

(1968)).  Because the Trustee stands in the shoes of the Debtor, the Defendants argue that the Trustee's RICO claims are barred as a matter of law based upon the Debtor's pre-bankruptcy misconduct. *See, Peterson v. McGladrey & Pullen, LLP,* 676 F.3d 594 (7th Cir. 2012); *Grede v. McGladrey & Pullen LLP*, 421 B.R. 879, 884-885 (N.D. Ill. 2009).

The doctrine has been defined, in this Circuit, through a series of key decisions.  The first such case, *Scholes v. Lehmann*, 56 F.3d 750 (1995), involved a Ponzi scheme wherein a receiver for the Securities and Exchange Commission sought to recover transfers as fraudulent under the Illinois Fraudulent Transfer Act.  The second decision, handed down in 2003, likewise involved a Ponzi scheme. *Knauer v. Jonathon Roberts Financial Group, Inc.*, 348 F.3d 230.  In both cases, defendants invoked the defense of *in pari delicto* arguing essentially that "the wrongdoer must not be allowed to profit from his wrong by recovering property that he had parted with in order to thwart his creditors." *Scholes* at 754.  While the Court rejected the defense in *Scholes*, it found that it did apply in *Knauer* to bar the receiver's alleged tort claims.  As explained by one court:

> In the Seventh Circuit's view, the key distinction between *Scholes* and *Knauer* was that in *Scholes*, the plaintiff receiver sought to recover diverted funds from the people who benefitted from the diversions, whereas in *Knauer* the receiver sued defendants who had derived no benefit from the embezzlements.  The application of the *in pari delicto* defense was appropriate in *Knauer* because the equitable balancing in that case favored the defendants; they had not seen a cent of the diverted funds and their 'involvement in the Ponzi scheme as a whole was quite minor.' (citations omitted).

*Marwil v. Ent & Imler CPA Group, PC*, 2004 WL 2750255 at *9 (S.D. Ind. 2004).

Finally, in *Peterson v. McGladrey & Pullen, LLP*, 676 F.3d 594 (7th Cir. 2012), a bankruptcy trustee filed suit against the debtor's auditor, alleging that McGladrey was negligent in failing to discover the debtor's Ponzi scheme.  The district court invoked the doctrine of *in pari delicto* in dismissing the complaint.  On appeal, the trustee asked the court to "knock out the *pari delicto*

19

defense altogether, so that the culpability of a corporate manager never would bar recovery against a negligent auditor." *Id.* at 597. The Seventh Circuit ultimately held that "a person sued by a trustee in bankruptcy may assert the defense of *in pari delicto*, if the jurisdiction whose law creates the claim permits such a defense outside of bankruptcy." *Id.* at 598.

ELC is charged with knowledge of the fraudulent scheme inasmuch as Gibson was the owner and business manager of ELC when the fraud was perpetrated. Because Gibson "caus[ed] billions of dollars of checks to be issued from various bank accounts" and directed and authorized McDonald to prepare fraudulent Borrowing Base Certificates, it is indisputable that ELC was aware of the fraud. Based upon the foregoing, the Court finds that the defense of *in pari delicto* may be asserted against the Trustee. Whether the defense is applicable so as to bar the Trustee's claim, however, will depend upon the equitable balancing between the parties.

In *Knauer*, *in pari delicto* was appropriate because the defendants "involvement in the Ponzi scheme as a whole was quite minor." *Knauer*, 348 F.3d at 237. Of course, the Court emphasized that there was "no allegation whatsoever that the defendants were directly involved in the embezzlements or benefitted from them." *Id.* "Had the broker dealers been directly involved in the embezzlements, or attained some tangible benefit from them, this would be a different case." *Id.* at 237, n. 6.

In *Baker v. Ernst & Young LLP*, 2004 WL 771230 (S.D.Ind.), Judge Hamilton applied the logic of *Scholes* and *Knauer* and concluded that *in pari delicto* did not require dismissal when there were allegations that the defendants were involved in the fraudulent conduct:

> Outside of a fraudulent conveyance scenario, the best case for *not* applying the *in pari delicto* defense is where the insider and the third-party tortfeasor were essentially acting as co-conspirators. That is a fair summary of plaintiffs' allegations here, though it remains to be seen whether they can be proved. The doctrine of *in*

20

*pari delicto* does not require dismissal at this stage of the litigation.

*Id.* at *10. Because the Trustee has alleged that each of the Defendants were involved in the planning of, or helped to perpetuate, the check kiting scheme, the Court finds that the defense of *in pari delicto* does not bar the Trustee's RICO claim at this stage of the proceeding.

<u>Section 502(d)</u>

Finally, the Trustee seeks to disallow any claims that these Defendants may have against ELC under section 502(d). To the extent that the Trustee retains a valid claim to recover estate assets against the Defendants, the Court **DENIES** the respective Motions to Dismiss Count V of the Trustee's Amended Complaint.

<u>Conclusion</u>

For all of the foregoing reasons, the Court finds that the **Defendant ADM Investor Services, Inc.'s Motion to Dismiss Amended Complaint, with Prejudice** [Docket No. 39]; **Defendant Larry Zeien II's Motion to Dismiss Amended Complaint with Prejudice** [Docket No. 41]; and **Defendants Robert Rufenacht and Rufenacht Commodities, Inc.'s Motion to Dismiss Amended Complaint, with Prejudice** [Docket No. 43], are each **DENIED** in their entirety.

**IT IS SO ORDERED AND ADJUDGED.**

###